GEORGE S. CARDONA
Acting United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (CA Bar Number 141720)
Assistant United States Attorney
Major Frauds Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Email: daniel.obrien@usdoj.gov
    Telephone: (213) 894-2468
    Facsimile: (213) 894-7631
Attorney for Plaintiff
United States of America

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 8 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                            DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>ROBERT A. KASIRER, and<br>HEALTH CARE HOLDINGS, L.L.C.,<br><br>　　　　　Defendants. | CR No. 07-268-GHK<br><br>PLEA AGREEMENT<br><br>(UNDER SEAL) |

1.   This constitutes the plea agreement between Health Care Holdings, L.L.C. (defendant"), by its agent Robert A. Kasirer, and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities.

PLEA

2.   Defendant gives up the right to indictment by a grand jury and agrees to plead guilty to a single-count information in

1  the form attached to this agreement or a substantially similar
2  form.

### NATURE OF THE OFFENSE

3.    Defendant is criminally responsible for the acts of its
agent when:

a.    the agent commits a criminal act;

b.    the agent acts within the scope of his authority or
apparent authority; and

c.    The intent of the agent was to benefit corporation.

4.    In order for defendant to be guilty of count one of the
information, which charges Conspiracy in a violation of Title 18,
United States Code, Section 371, the following must be true:

a.    First, there was an agreement between two or more
persons to commit the crime of embezzlement, theft, fraud, or
conversion from an organization or program receiving federal
funds in violation of Title 18, United States Code, Section 666;

b.    Second, the defendant, through its agent Kasirer,
became a member of the conspiracy knowing its object and
intending to help accomplish it; and

c.    Third, one of the members of the conspiracy
performed at least one overt act for the purpose of carrying out
the conspiracy.

5.    The elements of a Section 666 violation are as follows:

a.    First, an organization received, in any one-year
period encompassing the criminal activity, benefits in excess of
$10,000 under Medicare, a federal program;

b.    Second, Kasirer or his co-conspirator were agents
of the organization;

2

1        c.   Third, Kasirer or his co-conspirator knowingly and
2  intentionally embezzled, stole, obtained by fraud, or otherwise
3  without authority converted to the use of any person other than
4  the rightful owner over $5000 under the care, custody, or control
5  of the organization.

6     6.   Defendant admits that it is, in fact, guilty of the
7  offense of Conspiracy as described in count one of the
8  information.

9                    PENALTIES AND RESTITUTION

10    7.   The statutory maximum sentence that the Court can impose
11  for a violation of Title 18, United States Code, Section 371 is:
12  5 years probation; a fine of $500,000 or twice the gross gain or
13  gross loss resulting from the offense, whichever is greatest; and
14  a mandatory special assessment of $400.

15                         FACTUAL BASIS

16    8.   Defendant and the USAO agree and stipulate to the
17  statement of facts provided below.  This statement of facts
18  includes facts sufficient to support a plea of guilty to the
19  charge described in this agreement and to establish the
20  sentencing guideline factors set forth in paragraph 11 below.  It
21  is not meant to be a complete recitation of all facts relevant to
22  the underlying criminal conduct or all facts known to defendant
23  that relate to that conduct.

24  **Heritage Housing Development & Affiliates**

25      Heritage Housing Development, Inc. ("HHD"), was a not-for-
    profit corporation organized exclusively for charitable and
26  scientific purposes.  Formed in January 1993 by Emery Rubin
    ("Rubin"), HHD's original stated purpose was to acquire and
27  develop low income housing.  By 1995, its purpose was expanded to
    acquire, develop, and operate healthcare facilities serving the
28  elderly, particularly those suffering from Alzheimer's disease.

                                3

1 HHD's purchase and renovation of existing healthcare facilities was accomplished through separate non-profit affiliates ("the
2 Heritage Affiliates"), each of which were created to acquire a particular healthcare facility.

3

4     Each Heritage Affiliate financed its acquisition and renovation of its facility through the issuance of tax-exempt
municipal bonds.  These bonds were offered to the public through
5 prospecti known as Official Statements.

6     The Heritage Affiliates and the location of the facilities
they acquired were as follows:
7

8
| Non-Profit Entity | Municipality |
| --- | --- |
| Rancho | Rancho Cucamonga, CA |
| Danforth | Texas City, TX |
| Sam Houston | Houston, TX |
| St. Joseph's | Tarrant County, TX |
| Sarasota | Mexico Beach, FL |
| Chicago | Chicago, IL |
| Duval | Austin, TX |
| St. Joseph's | Tarrant County TX |
| Rancho | Rancho Cucamonga, CA |
| Eastwood | Tarrant County, TX |
| Seminole | Mexico Beach, FL |
| Valley | Brownsville, TX |

15     During the period 1996 through 2000, HHD received through
the Heritage Affiliates significant cost reimbursements from the
16 U.S. Government's Medicare program.  During each of the calendar years 1996, 1997, 1998, 1999, and 2000, HHD received through the
17 Heritage Affiliates in excess of $10,000 in Medicare benefits.

18     From January 1993 through February 18, 1998, Rubin was an
agent of HHD and the Heritage Affiliates.  From January 1993
19 through April 1994, he was President of HHD.  From April 1994
through August 18, 1997, he held the position of "Consultant" or
20 "Senior Consultant."  From August 18, 1997 through February 18,
1998, he again occupied the position of President.
21

22     From February 1996 through February 14, 2000, defendant was
an agent of HHD and the Heritage Affiliates through contractual
23 arrangements established between the various Heritage Affiliates
and various health care management companies with whom the
24 defendant was employed.  During the period February 1996 through
June 1997, the Heritage Affiliates were managed through Iatros
25 Health Network, Inc. ("IHN"), a publicly traded health care
management company headquartered in Atlanta, Georgia, and its
26 various subsidiaries.  Defendant headed the west coast operations
of Iatros through three subsidiaries called Iatros Health
27 Services Group, Inc.,  Iatros Respiratory Corporation, Inc., and
its successor-in-interest Iatros Acute Care Services, Inc.
During the period June 1997 through February 14, 2000, various
28 Heritage Affiliates were managed by two health care management

4

1  companies, Health Care Holdings, Inc. ("HCH") and Care Continuum,
   Inc. ("Care"), both of which were formed by the defendant.
2  Defendant owned 100% of both HCH and Care and occupied the
   positions of Chairman of the Board and Chief Executive Officer
3  for both companies.

4  **The Agreement**

5      Sometime prior to February 1995, Kasirer and Rubin conspired
   to, without authority, knowingly convert to the use of a person
6  other than the rightful owner funds under the custody and control
   of HHD and the Heritage Affiliates.
7

8      These defalcations took many forms, including the following:

9      a.   Kasirer received a finder's fee in connection with the
   acquisition of Heritage Rancho which was not disclosed in the
   Heritage Rancho Official Statement.
10

11     b.   Kasirer received fees from Bond Counsel, which were not
   disclosed in the official statements.

12     c.   Kasirer was advanced funds from HHD prior to the times
   he was entitled to the funds.
13

14     d.   Funds required to be loaned to the Heritage Affiliates
   by the management companies pursuant to Operating Deficit
   Agreements ("ODAs") were returned to Kasirer, HCH, and Care.
15

16     e.   Kasirer, HCH, and Care obtained more fees than they were
   entitled to receive under management contracts with the various
   Heritage Affiliates.
17

18     During the period 1996 through 1999, in furtherance of the
   conspiracy, Kasirer and Rubin wrongfully converted at least
19 $5,672,050 under the custody and control of HHD and the Heritage
   Affiliates.

20 **Overt Acts**

21     In furtherance of the conspiracy and to accomplish the
   objects of the conspiracy, Kasirer caused various overt acts to
22 be committed within the Central District of California, including
   the following:
23

24     a.   On February 23, 1996, in connection with the
   acquisition of Heritage Rancho, Kasirer received a check in the
   amount of $120,000 from the entity relinquishing its rights to
25 the Heritage Rancho property.

26     b.   On June 28, 1996, Rubin issued a $198,746 cashier's
   check drawn on HHD's account and made payable to Johnson &
27 Johnson, a creditor of Kasirer.

28     c.   On October 30, 1998, a California law firm which was

1  Bond Counsel on a Heritage offering issued a check in the amount
   of $24,000 to Kasirer.
2
          d.   On December 23, 1998, a representative of HHD and the
3  Danforth, Sam Houston, and St. Joseph Affiliates transferred a
   total of $250,000 to HCH for the payment of management fees.
4
          e.   On January 7, 1999, a representative of the Duval,
5  Chicago, and Sarasota Affiliates transferred a total of $770,000
   in ODA funds to a company owned by Kasirer.
6
   **Corporate Liability**
7
          During the period June 1997 through February 2000, Kasirer
8  was an agent of HCH, acting within the scope of his duties as
   Chief Executive Officer.  By engaging is the aforementioned
9  conduct, Kasirer intended, in part, to benefit HCH, particularly
   with regard to the award of management fees and other
10 disbursements which were deposited into HCH bank accounts.

11                 WAIVER OF CONSTITUTIONAL RIGHTS

12       9.   By pleading guilty, defendant gives up the following

13 rights:

14            a)   The right to persist in a plea of not guilty.

15            b)   The right to a speedy and public trial by jury.

16            c)   The right to the assistance of legal counsel at

17 trial.   (In this regard, defendant understands that, despite its

18 plea of guilty, it retains the right to be represented by counsel

19 at every other stage of the proceedings.)

20            d)   The right to be presumed innocent and to have the

21 burden of proof placed on the government to prove defendant

22 guilty beyond a reasonable doubt.

23            e)   The right to confront and cross-examine witnesses

24 against defendant.

25            f)   The right, if defendant wished, to present evidence

26 in opposition to the charges, including the right to call

27 witnesses and to subpoena those witnesses to testify.

28            g)   Any and all rights to pursue any affirmative

                                  6

1  defenses, Constitutional claims, and other pretrial motions that
2  have been filed or could be filed.

3                        SENTENCING FACTORS

4      10.  Defendant understands that the Court is required to
5  consider the United States Sentencing Guidelines ("U.S.S.G." or
6  "Sentencing Guidelines") among other factors in determining
7  defendant's sentence.  Defendant understands that the Sentencing
8  Guidelines are only advisory, and that after considering the
9  Sentencing Guidelines, the Court may be free to exercise its
10 discretion to impose any reasonable sentence up to the maximum
11 set by statute for the crime of conviction.

12     11.  Defendant and the USAO agree and stipulate that the
13 November 2000 edition of the Sentencing Guidelines applies and to
14 the following applicable sentencing guideline factors:

15       Base Offense Level:          6 [U.S.S.G. § 2F1.1]
16       Specific Offense Characteristics
17       ($10,000,000>Loss>$5,000,000): 14 [U.S.S.G. § 2F1.1(b)(1)]
18       (More than minimal planning):  2 [U.S.S.G. § 2F1.1(b)(2)]
19       Base Fine:            $1,200,000 [U.S.S.G. § 8C2.4(d)]
20       Culpability score:  3 (5 points minus 2) [U.S.S.G. § 8C2.5]
21       Fine range:          $720,000 to $1,440,000 [U.S.S.G. § 8C2.7]

22       f)  A term of probation of at least one year but not
23       more than five years pursuant to guideline § 8D1.2.

24     12.  The stipulations in this agreement do not bind either
25 the United States Probation Office or the Court.  Both defendant
26 and the USAO are free to: (a) supplement the facts by supplying
27 relevant information to the United States Probation Office and
28 the Court, (b) correct any and all factual misstatements relating

                                7

1 to the calculation of the sentence, and (c) argue on appeal and
2 collateral review that the Court's sentencing guidelines
3 calculations are not error, although each party agrees to
4 maintain its view that the calculations in paragraph 11 are
5 consistent with the facts of this case.

6                    DEFENDANT'S PLEA OBLIGATIONS

7     15.   In connection with its plea, defendant agrees that it
8 will:

9          a)   Plead guilty as set forth in this agreement.

10         b)   Abide by all sentencing stipulations contained in
11 this agreement.

12         c)   Appear as ordered for all court appearances,
13 surrender as ordered for service of any sentence of confinement,
14 pay any ordered fines and restitution, obey all conditions of any
15 bond, and obey any other ongoing court order in this matter.

16         d)   Pay the applicable special assessment at or before
17 the time of sentencing unless defendant lacks the ability to pay.

18                    THE USAO'S OBLIGATIONS

19    16.   If defendant complies fully with all defendant's
20 obligations under this agreement, the USAO agrees:

21         a)   To abide by all sentencing stipulations contained
22 in this agreement.

23         b)   Except for criminal tax violations (including
24 conspiracy to commit such violations chargeable under 18 U.S.C.
25 § 371), not to further prosecute defendant for any offense
26 arising out of defendant's conduct (i) described in the
27 stipulated factual basis set forth in this agreement, (ii)
28 arising out of defendant's conduct in connection with the

                              8

1  operation of any entity associated with Heritage Housing
2  Development (collectively, "the Heritage Projects"), or (iii) the
3  offering and sale to the public of bonds associated with Heritage
4  Projects.  Defendant understands that the USAO is free to
5  prosecute defendant for any other unlawful past conduct or any
6  unlawful conduct that occurs after the date of this agreement.
7  Defendant agrees that at the time of sentencing the Court may
8  consider the uncharged conduct in determining the applicable
9  Sentencing Guidelines range, where the sentence should fall
10 within that range, the propriety and extent of any departure from
11 that range, and the determination of the sentence to be imposed
12 after consideration of the sentencing guidelines and all other
13 relevant factors.

14                          BREACH OF AGREEMENT

15      17.  If defendant, at any time between the execution of this
16 agreement and defendant's sentencing, knowingly violates or fails
17 to perform any of defendant's obligations under this agreement,
18 the USAO may declare this agreement breached.  If the USAO
19 declares this agreement breached, and the Court finds such a
20 breach to have occurred, defendant will not be able to withdraw
21 its guilty plea, and the USAO will be relieved of all of its
22 obligations under this agreement.  In particular:

23          a)    The USAO will no longer be bound by any agreements
24 concerning sentencing and will be free to seek any sentence up to
25 the statutory maximum for the crime to which defendant has
26 pleaded guilty.

27          b)    The USAO will no longer be bound by any agreements
28 regarding criminal prosecution, and will be free to prosecute

1  defendant for any crime, including charges that the USAO would
2  otherwise have been obligated not to prosecute pursuant to this
3  agreement.

4      18.  Following a knowing and willful breach of this
5  agreement by defendant, should the USAO elect to pursue any
6  charge not filed as a result of this agreement, then:

7          a)  Defendant agrees that any applicable statute of
8  limitations is tolled between the date of defendant's signing of
9  this agreement and the commencement of any such prosecution or
10 action.

11         b)  Defendant gives up all defenses based on the
12 statute of limitations, any claim of preindictment delay, or any
13 speedy trial claim with respect to any such prosecution, except
14 to the extent that such defenses existed as of the date of
15 defendant's signing of this agreement.

16      LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK

17     19.  Defendant gives up the right to appeal any sentence
18 imposed by the Court, and the manner in which the sentence is
19 determined, provided that (a) the sentence is within the
20 statutory maximum specified above and is constitutional, (b) the
21 Court in determining the applicable guideline range does not
22 depart upward in offense level, and (c) the Court imposes a
23 sentence within or below the range corresponding to the
24 determined total fine range.  Defendant also gives up any right
25 to bring a post-conviction collateral attack on the conviction or
26 sentence, except a post-conviction collateral attack based on a
27 claim of ineffective assistance of counsel, a claim of newly
28 discovered evidence, or a explicitly retroactive change in the

10

1  applicable Sentencing Guidelines, sentencing statutes, or
2  statutes of conviction.

3      20.  The USAO gives up its right to appeal the Court's
4  sentence, provided that (a) the Court in determining the
5  applicable guideline range does not depart downward in offense
6  level, and (b) the Court imposes a sentence within or above the
7  range corresponding to the determined fine range.

8                RESULT OF VACATUR, REVERSAL OR SET-ASIDE

9      21.  Defendant agrees that if its count of conviction is
10 vacated, reversed, or set aside, the USAO may ask the Court to
11 void the entire plea agreement with both the USAO and defendant
12 being released from all of their obligations under this
13 agreement, except that should the USAO subsequently elect to
14 pursue any charge not filed as a result of this agreement, the
15 defendant agrees that he will be bound by the provisions of
16 paragraph 18(a) and 18(b) pertaining to the tolling of the
17 statute of limitations, preindictment delay and speedy trial.

18                        COURT NOT A PARTY

19     22.  The Court is not a party to this agreement and need not
20 accept any of the USAO's sentencing recommendations or the
21 parties' stipulations.  Even if the Court ignores any sentencing
22 recommendation, finds facts or reaches conclusions different from
23 any stipulation, and/or imposes any sentence up to the maximum
24 established by statute, defendant cannot, for that reason,
25 withdraw defendant's guilty plea, and defendant will remain bound
26 to fulfill all defendant's obligations under this agreement.  No
27 one - not the prosecutor, defendant's attorney, or the Court -
28 can make a binding prediction or promise regarding the sentence

                                11

1  defendant will receive, except that it will be within the
2  statutory maximum.

3                    NO ADDITIONAL AGREEMENTS

4      23.   Except as set forth herein, there are no promises,
5  understandings or agreements between the USAO and defendant or
6  defendant's counsel.  Nor may any additional agreement,
7  understanding or condition be entered into unless in a writing
8  signed by all parties or on the record in court.

9          PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

10     24.   The parties agree and stipulate that this Agreement
11  will be considered part of the record of defendant's guilty plea
12  hearing as if the entire Agreement had been read into the record
13  of the proceeding.

14     This agreement is effective upon signature by defendant and
15  an Assistant United States Attorney.

16  AGREED AND ACCEPTED

17  UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA
18
    GEORGE S. CARDONA
19  Acting United States Attorney

20
21  _____              5/14/07
    DANIEL J. O'BRIEN                        Date
22  Assistant United States Attorney

23
24     I have read this agreement and carefully discussed every
25  part of it with the attorney representing Heath Care Holdings,
26  L.L.C.  I understand the terms of this agreement, and I
27  voluntarily agree to those terms.  The attorney has advised me of
28  my rights, of possible defenses, of the Sentencing Guideline

                              12

1  provisions, and of the consequences of entering into this
2  agreement on behalf of the corporation.  No promises or
3  inducements have been made to me other than those contained in
4  this agreement.  No one has threatened or forced me in any way to
5  enter into this agreement.  Finally, I am satisfied with the
6  representation of the attorney in this matter.

7
8
9  ROBERT A. KASIRER                          Date 5/14/07
   Chief Executive Officer of
10 Defendant Health Care Holdings, L.L.C.

11
       I am the attorney for defendant Health Care Holdings, L.L.C.
12
   I have carefully discussed every part of this agreement with my
13
   client.  Further, I have fully advised my client of its rights,
14
   of possible defenses, of the Sentencing Guidelines' provisions,
15
   and of the consequences of entering into this agreement.  To my
16
   knowledge, my client's decision to enter into this agreement is
17
   an informed and voluntary one.
18

19
20 JACK DICANIO                               Date 5/14/07
   Counsel for
21 Defendant Health Care Holdings, L.L.C.

22

23

24

25

26

27

28

                              13

1    ATTACHMENT
2
3
4
5
6
7
8    UNITED STATES DISTRICT COURT
9    FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
11   UNITED STATES OF AMERICA,        )   CR 06-
                                      )
12                  Plaintiff,        )   I N F O R M A T I O N
                                      )
13              v.                    )   [18 U.S.C. § 371: Conspiracy]
                                      )
14   ROBERT A. KASIRER, and           )
     HEALTH CARE HOLDINGS, L.L.C.,    )
15                                    )
                    Defendants.       )
16                                    )
                                      )
17                                    )

The United States Attorney charges:

GENERAL ALLEGATIONS

**Heritage Housing Development**

1.   At all times relevant to this Information, Heritage
Housing Development, Inc. ("HHD"), was a not-for-profit
corporation organized exclusively for charitable and scientific
purposes.  Formed in January 1993, HHD's original stated purpose
was to acquire and develop low income housing.  By 1995, its
purpose was expanded to acquire, develop, and operate healthcare

//

//

DOB:dob

1 facilities serving the elderly, particularly those suffering from
2 Alzheimer's disease.  HHD's purchase and renovation of existing
3 healthcare facilities was accomplished through separate non-
4 profit affiliates ("the Heritage Affiliates"), each of which were
5 created to acquire a particular healthcare facility.

6     2.   The Heritage Affiliates and the location of the
7 facilities they acquired were as follows:

8     <u>Non-Profit Entity</u>   <u>Municipality</u>

| Non-Profit Entity | Municipality |
|---|---|
| Rancho | Rancho Cucamonga, CA |
| Danforth | Texas City, TX |
| Sam Houston | Houston, TX |
| St. Joseph's | Tarrant County, TX |
| Sarasota | Mexico Beach, FL |
| Chicago | Chicago, IL |
| Duval | Austin, TX |
| St. Joseph's | Tarrant County TX |
| Rancho | Rancho Cucamonga, CA |
| Eastwood | Tarrant County, TX |
| Seminole | Mexico Beach, FL |
| Valley | Brownsville, TX |

16     3.   During the period 1996 through 2000, HHD received
17 through the Heritage Affiliates significant cost reimbursements
18 from the U.S. Government's Medicare program.  During each of the
19 calendar years 1996, 1997, 1998, 1999, and 2000, HHD received
20 through the Heritage Affiliates in excess of $10,000 in Medicare
21 benefits.

22     4.   From January 1993 through February 18, 1998, Rubin was
23 an agent of HHD and the Heritage Affiliates.  From January 1993
24 through April 1994, he was President of HHD.  From April 1994
25 through August 18, 1997, he held the position of "Consultant" or
26 "Senior Consultant."  From August 18, 1997 through February 18,
27 1998, he again occupied the position of President.

28     5.   From February 1996 through February 14, 2000, defendant

1  ROBERT A. KASIRER ("defendant KASIRER") was an agent of HHD and
2  the Heritage Affiliates.  During this period, defendant KASIRER
3  was the manager of the Heritage Affiliates through contractual
4  arrangements with various health care management companies
5  defendant KASIRER either owned or with whom he was employed.
6  During the period February 1996 through June 1997, defendant
7  managed the Heritage Affiliates through Iatros Health Network,
8  Inc. ("IHN"), a publicly traded health care management company
9  headquartered in Atlanta, Georgia, and its various subsidiaries.
10 During the period June 1997 through August 1999, defendant
11 managed the Heritage Affiliates through two health care
12 management companies he created and owned, Health Care Holdings,
13 Inc. ("HCH") and Care Continuum, Inc. ("Care").

14 **Incorporation By Reference**

15      6.   These General Allegations are incorporated into each and
16 every count of the Information as though fully alleged therein.

3

1                          [18 U.S.C. § 371]

2  **Object Of The Conspiracy**

3      7.   Sometime prior to February 1995 and continuing to in or

4  about December 2000, in Los Angeles County, within the Central

5  District of California, and elsewhere, defendant ROBERT A.

6  KASIRER, unindicted co-conspirator Emery Rubin ("Rubin"), and

7  others known and unknown, knowingly and willfully conspired and

8  agreed to embezzle, steal, obtain through fraud, wrongfully

9  convert funds to the use of a person other than the rightful

10 owner, and intentionally misapply over $5,000 owned by, and under

11 the custody and control of, HHD and the Heritage Affiliates in

12 violation of Title 18, United States Code, Section 666.

13 **Means Of The Conspiracy**

14      8.   The means through which the conspiracy was to be

15 accomplished were as follows:

16      The General Arrangement

17           a.   Defendant KASIRER would acquire the right to

18 acquire various health care facilities throughout the county.

19           b.   Because defendant KASIRER lacked the financial ability

20 to acquire, renovate, and put the facilities into operation which

21 was necessary to enhance their value and realize any gain, Rubin

22 would agree to form HHD and the Heritage Affiliates which would

23 be able to raise funds from bond investors to finance the

24 purchase and renovation of the facilities.  The Heritage

25 Affiliates would then purchase the right to purchase the

26 facilities from defendant KASIRER.

27           c.   Rubin and defendant KASIRER would agree to

28

                               4

1  embezzle, steal, obtain through fraud, wrongfully convert, and
2  intentionally misapply at least $5,672,050 owned by, and under
3  the control of, HHD and the Heritage Affiliates for their own
4  personal gain.

5       Fraudulent Finder's Fee In Connection With The Acquisition
6       Of The Heritage Rancho Facility

7            a.   Defendant KASIRER would locate a hospital facility
8  in Rancho Cucamonga and negotiate its purchase on behalf of
9  Heritage Rancho.  Defendant KASIRER would arrange for a third
10 party ("the flipper") to act as an intermediary buyer.  The
11 flipper would then sell the purchase rights to Heritage Rancho in
12 return for $500,000 cash and a $1,200,000 unsecured note in favor
13 of the flipper that was subordinated to Heritage Rancho's
14 obligations to its bond investors.

15           b.   The flipper would agree to split its profits with
16 defendant KASIRER on a 70-30% basis.

17           c.   The Chairman of the Board for Heritage Rancho,
18 would transfer $500,000 to the flipper and sign an unsecured
19 promissory note in the amount of $1,200,000 for the benefit of
20 the flipper unaware that a 30% of these amounts would be directed
21 to defendant KASIRER.

22           d.   Rubin would execute two unsecured promissory notes,
23 one in the amount of $840,000 in favor of the flipper and one in
24 the amount of $360,000 in favor of defendant KASIRER's wife to
25 supersede the $1,200,000 note payable to the flipper.

26           e.   The flipper would issue a check in the amount of
27 $120,000 to defendant KASIRER which represented his 30% of the
28

                                    5

1   cash profit.

2           f.   Rubin would retain an investment banking firm to
3   issue a private placement memorandum to investors to extinguish
4   the $1,200,000 unsecured, subordinated note.   The private
5   placement memorandum would not disclose defendant KASIRER's
6   interest in the $1,200,000 note or the fact that the note had
7   been superseded by two notes payable to the flipper and defendant
8   KASIRER's wife.

9           g.   The flipper and defendant KASIRER would receive
10  cash distributions obtained through the private placement
11  offering.

12          Kickbacks and Referral Fees

13          a.   Defendant KASIRER and Rubin would negotiate
14  contracts on behalf of the Heritage Affiliates with various
15  service providers.

16          b.   Defendant KASIRER and Rubin would demand kickbacks
17  and referral fees, typically representing 40% of the contracted
18  amount from the various service providers.

19          c.   The service providers would issue inflated invoices
20  to the Heritage Affiliates for the services they rendered, with
21  no mention of the fact that they had agreed to pay kickbacks and
22  referral fees to Rubin and defendant KASIRER.

23          d.   Upon receipt of payment, the service providers
24  would issue checks to Rubin and defendant KASIRER or credit Rubin
25  and defendant KASIRER for debts owed from previous transactions.

26          Thefts From HHD

27          a.   Rubin would write checks drawn from HHD's bank

28

                                   6

1  accounts and made payable to Rubin and to defendant KASIRER's
2  wife in equal amounts.

3         b.   Rubin would cause the payments to defendant
4  KASIRER's wife to be characterized in HHD's accounting records as
5  "consulting fees", even though defendant KASIRER's wife performed
6  no services in connection with the payments.

7        Thefts From Heritage Affiliates

8         a.   Rubin would write checks drawn from the bank
9  accounts of Heritage Danforth, Heritage Sam Houston, and Heritage
10 St. Joseph made payable to Rubin and to defendant KASIRER's wife
11 in equal amounts.

12        b.   Rubin would cause the payments to defendant
13 KASIRER's wife to be characterized in the various Heritage
14 Affiliates' accounting records as "consulting fees", even though
15 defendant KASIRER's wife performed no services in connection with
16 the payments.

17        Conversion of Funds Received By HHD From IHN

18        a.   Under various Operating Deficit Agreements
19 ("ODAs"), the management companies would agreed to loan, on an
20 unsecured and subordinated basis, up to $500,000 for the Rancho
21 project and up to $250,000 for each of the other Heritage
22 projects.  The purpose of the ODAs was to have the management
23 companies invested in the projects, thereby creating an incentive
24 for the manager to ensure that the projects were a success.
25 Repayment of the ODA was to be made pursuant to a subordination
26 agreement whereby payment would be subordinated to debt service
27 on the bonds and operating expenses.  According to the official
28

7

1 statements, the obligation to fund the ODA typically would not
2 end until certain exacting financial criteria were met or upon
3 termination of the management contract.

4      b.  HHD and the Heritage Affiliates would receive
5 infusions of cash from IHN pursuant to its ODA lending
6 obligations to the various Heritage Affiliates.

7      c.  Upon receipt of the funds from IHN, Rubin would
8 write checks in the same amount made payable to defendant
9 KASIRER's wife.

10      d.  Rubin would cause the payments to be characterized
11 in the HHD's accounting records as "consulting fees", even though
12 defendant KASIRER's wife performed no services in connection with
13 the payments.

14     Theft Of Operating Deficit Agreement Funds

15      a.  In connection with the Heritage Eastwood facility
16 acquisition, defendant KASIRER would be entitled to receive
17 $773,169.83.  Instead of issuing this amount, a representative of
18 one of the Heritage Affiliates would cause $770,000 to be wired
19 to one of defendant KASIRER's companies as a "loan."  These
20 funds, along with other available monies, would be then disbursed
21 to Heritage Danforth, Heritage Sam Houston, and Heritage Duval to
22 satisfy the ODA obligations owed by defendant KASIRER's
23 management companies to those projects.

24      b.  In connection with the Heritage Seminole facility
25 acquisition, defendant KASIRER would be entitled to receive
26 $670,101.  Consequently, a representative of one of the Heritage
27 Affiliates would cause a $670,101 check to be issued to
28

8

1 to one of defendant KASIRER's companies.

2       c.   Having already received a $770,000 "loan" at the
3 time of the Eastwood project acquisition and $670,101 at the time
4 of the Heritage Seminole project acquisition, defendant KASIRER
5 would then receive payment on the Eastwood project in the form of
6 a $773,169.83 wire transfer.  The funding for this transaction
7 would come from $770,000 in wire transfers from Heritage Duval,
8 Heritage Chicago, and Heritage Sarasota.

9       d.   The $770,000 loan would never be repaid and the
10 liability defendant KASIRER owed to the Heritage Affiliates would
11 be obscured due to the similarity in amounts and confusion on the
12 part of the Heritage Affiliates accountants.

13     Conversion of Funds Received By Physician Investors

14       a.   Defendant KASIRER would solicit various Beverly
15 Hills physicians to invest as limited partners in various
16 hospital ventures ("the ventures") associated with HHD.  Under
17 the terms of the investment agreement, each of the physicians
18 would receive a loan from HHD to finance their initial
19 investment.

20       b.   After the ventures failed, the physicians would
21 refund the loans they had received from HHD.

22       c.   Upon receipt of the funds from the physicians,
23 Rubin would write checks in the same amount made payable to
24 defendant KASIRER's wife.

25       d.   Defendant KASIRER and Rubin would cause HHD's
26 accounting records to record the receipt of funds from the
27 physicians as consulting income and the payments to defendant
28

9

1  KASIRER's wife as consulting expenses thereby obscuring the true
2  nature of the transactions.

3      Conversions Of Funds Lent To Defendant KASIRER

4          a.   Defendant KASIRER would ask Rubin to have HHD
5  advance loans to defendant KASIRER, defendant KASIRER's wife, and
6  defendant KASIRER's creditors.

7          b.   On some occasions defendant KASIRER would repay the
8  loans but defendant KASIRER and Rubin would cause HHD's
9  accounting records to characterize the loan repayments as the
10 satisfaction of the ODA obligations owed by defendant KASIRER's
11 management companies.

12         c.   On other occasions defendant KASIRER would not
13 repay the loans.  In such cases, Rubin and defendant KASIRER
14 would eliminate the loans on HHD's accounting records by writing
15 checks from one HHD account to another and then characterizing
16 the transaction on HHD's accountings books as a loan repayment
17 from defendant KASIRER.

18      Excessive Management Fees

19         a.   Defendant KASIRER would extract more fees than HCH
20 and Care were entitled to under the management contracts with the
21 various Heritage Affiliates by backdating the effective dates of
22 those contracts, mis-characterizing obligations created under the
23 contracts, and the mis-characterizing the nature of various
24 obligations between the Affiliates, the management companies, and
25 subcontractors to the management companies.

26      Corporate Liability

27         a.   During the period June 1997 through August 1999,

28                              10

1 Kasirer was an agent of HCH, acting within the scope of his

2 duties as Chief Executive Officer.  By engaging is the

3 aforementioned conduct, Kasirer intended, in part, to benefit

4 HCH, particularly with regard to the award of management fees and

5 other disbursements which were deposited into HCH bank accounts.

6 **Overt Acts**

7      9.   In furtherance of the conspiracy and to accomplish the

8 objects of the conspiracy, members of the conspiracy committed

9 various overt acts within the Central District of California,

10 including, but not limited to, the following:

11           a.   On or about February 22, 1996, Rubin issued a

12 $50,000 check on behalf of Heritage Rancho to defendant KASIRER's

13 wife for "consulting."

14           b.   On or about February 22, 1996, Rubin issued a

15 $50,000 check on behalf of Heritage Rancho to Rubin for

16 "consulting."

17           c.   On or about February 23, 1996, in connection with

18 the acquisition of Heritage Rancho, defendant KASIRER received a

19 check in the amount of $120,000 from the entity relinquishing its

20 rights to the Heritage Rancho property.

21           d.   On or about May 14, 1996, Rubin issued a HHD check

22 in the amount of $28,000 to defendant KASIRER's wife.

23           e.   On or about June 28, 1996, Rubin issued a $198,746

24 cashier's check drawn on HHD's account and made payable to

25 Johnson & Johnson, a creditor of defendant KASIRER.

26           f.   On or about June 18, 1996, HHD received a $10,000

27 check from a Beverly Hills, California physician.

28

                                11

1        g.   On or about December 28, 1996, Heritage Rancho
2   issued a check in the amount of $1,634.61 to defendant KASIRER's
3   wife for consulting regarding the establishment and
4   implementation of outpatient services.

5        h.   On or about January 6, 1997, an interior design
6   consultant issued a false invoice in the amount of $50,000 to
7   HHD.

8        i.   On or about January 7, 1997, Rubin issued a $20,000
9   check on behalf of Heritage Danforth to defendant KASIRER's wife
10  for "consulting."

11       j.   On or about January 7, 1997, Rubin issued a $20,000
12  check on behalf of Heritage Danforth to Rubin's wife for
13  "consulting."

14       k.   In or about March 1997, a health care management
15  company ("the management company") executed a contract granting
16  IHN 50% of the fees generated by the management company's
17  contracts with the Heritage Affiliates.

18       l.   On or about March 19, 1997, Rubin issued a $125,000
19  check on behalf of HHD to defendant KASIRER's wife for
20  "consulting."

21       m.   On or about March 19, 1997, Rubin issued a $125,000
22  check on behalf of HHD to Rubin for "consulting."

23       n.   On or about April 2, 1997, Rubin issued a $30,000
24  check on behalf of Heritage Sam Houston to defendant Kasirer's
25  wife for "consulting."

26       o.   On or about April 2, 1997, Rubin issued a $30,000
27  check on behalf of Heritage Sam Houston to Rubin for

28

12

1 | "consulting."

2 |      p.   On or about May 28, 1997, Rubin issued a $65,000
3 | check on behalf of Heritage St. Joseph's to defendant KASIRER's
4 | wife for "consulting."

5 |      q.   On or about May 28, 1997, Rubin issued a $65,000
6 | check on behalf of Heritage St. Joseph's to Rubin for
7 | "consulting."

8 |      r.   On or about October 30, 1998, a California law firm
9 | which was Bond Counsel on a Heritage offering issued a check in
10 | the amount of $24,000 to defendant KASIRER.

11 |      s.   On or about December 23, 1998, a representative of
12 | HHD and the Danforth, Sam Houston, and St. Joseph Affiliates
13 | transferred a total of $250,000 to HCH for the payment of
14 | management fees.

15 |      t.   On or about January 7, 1999, a representative of
16 | the Duval, Chicago, and Sarasota Affiliates transferred a total
17 | of $770,000 in ODA funds to a company owned by defendant KASIRER.

18 | GEORGE S. CARDONA
     Acting United States Attorney
19 |

20 |
     THOMAS P. O'BRIEN
21 | Assistant United States Attorney
     Chief, Criminal Division
22 |

23 |
     CHRISTINE EWELL
24 | Assistant United States Attorney
     Chief, Major Frauds Section
25 |

26 |
     DANIEL J. O'BRIEN
27 | Assistant United States Attorney
     Major Frauds Section
28 |

13

1                     **CERTIFICATE OF SERVICE**

2     I, **David Lavoie**, declare:

3     That I am a citizen of the United States and resident or

4 employed in Los Angeles County, California; that my business

5 address is the Office of United States Attorney, United States

6 Courthouse, 312 North Spring Street, Los Angeles, California

7 90012; that I am over the age of eighteen years, and am not a

8 party to the above-entitled action;

9     That I am employed by the United States Attorney for the

10 Central District of California who is a member of the Bar of the

11 United States District Court for the Central District of

12 California, at whose direction I served a copy of **PLEA AGREEMENT**
service was:

13

14   [] Placed in a closed      [XX] Placed in a sealed
envelope, for collection   envelope for collection and

15 and interoffice delivery   mailing via United States Mail,
addressed as follows:     addressed as follows:

16 **[] By hand delivery**      [] **By facsimile as follows:**
**addressed as follows:**

17

18 [] By messenger as follows: [] By federal express as follows:

19              **Jack Dicanio**

20      **Skadden, Arps, Slate, Meagher & Flom**

21       **300 South Grand Avenue, Suite 3400**
         **Los Angeles, CA 90071**

22     This Certificate is executed on May 16, 2007, at Los

23 Angeles, California.

24     I certify under penalty of perjury that the foregoing is

25 true and correct.

26 
David Lavoie

27

28